UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:07CV-414-H

CLAUDETTE MITCHELL                                                      PLAINTIFF

V.

UNIVERSITY MEDICAL CENTER, INC.                                         DEFENDANT

**MEMORANDUM OPINION**

Pro se Plaintiff, Claudette Mitchell ("Mitchell"), brings this action alleging religious discrimination under the Kentucky Civil Rights Act, hostile work environment based on religion and violation of her First Amendment right to free speech.[1] Her claims arise out of a dispute with her former employer, Defendant University Medical Center, Inc. d/b/a University of Louisville Hospital ("Hospital"), over religious discussions she had with various co-workers. The matter is now before the Court on Defendant's Motion for Summary Judgment and its Motion to Strike various lengthy or late filings. Plaintiff has filed a Motion to Produce and a Motion to Strike that the Court will also address in this opinion, even though they have not been fully briefed.

This case presents difficult and sensitive questions related to the tension between an employer's need to maintain a professional, harassment-free workplace and an employee's strong personal religious conviction that she share her faith and revelations. Plaintiff's *pro se*

---

[1] Plaintiff's Complaint alleges disability discrimination. Before he withdrew, Plaintiff's counsel clarified that the disability references were typographical errors and that Plaintiff was actually claiming religious discrimination. (Pl.'s Dep. 131:21-23, Dec. 9, 2009.)

status has made the Court's task even more difficult due to her undisciplined approach to the arguments. Nevertheless, the Court has carefully reviewed and considered all her submissions, and has discussed the case with Plaintiff in chambers. For the reasons that follow, the Court will deny Defendant's Motion to Strike,[2] deny Plaintiff's Motion to Strike, sustain Defendant's Motion for Summary Judgment and dismiss the case. These decisions render moot Plaintiff's Motion to Produce.

**I.**

In March 2002, Plaintiff Mitchell began working as a staff nurse for University of Louisville Hospital, a non-profit corporation that is the primary trauma and teaching hospital in Louisville. Mitchell was responsible for patient care in the Hospital's Operating Room. During her three years there, Mitchell received pay increases and positive performance evaluations, and was considered a good employee.

The events giving rise to this lawsuit began on the evening of February 6, 2005, when Mitchell, a devout Christian, received a call at home from her cousin, Cosby, directing her to read a certain passage in the Bible. After reading the passage, Mitchell asserts that God told her to read other passages and to "calculate" them. Ultimately, Mitchell's calculation produced several dates including 12/21/2033.[3] Mitchell believed these numbers to be spiritually significant and that the 12/21/2033 date possibly represented "the date for the end of the world"

---

[2] The Court denies this motion even though some of Plaintiff's filings were late and/or exceeded the page limits set by the Court. This decision is reasonable because Plaintiff is proceeding pro se and has made a good faith attempt to respond in a timely manner to Defendant's filings.

[3] Plaintiff's calculations also produced the numbers 9/11/2001, the date of the terrorist attack on the Twin Towers in New York City, and 3/11/2005, the date Mitchell eventually left University Hospital.

or "the date of the Antichrist." (Pl.'s Dep. 139:4-6, Dec. 9, 2009.)[4] Mitchell described her calculations at length during her deposition. For example, she explained one calculation from the book of Revelation – which revealed the year 2033 – like this:

> [T]his one is from Chapter 10, in Chapter 10 you have 11 verses, Revelation Chapter 10 holds 11 verses. So God told me to write down the day and the month, so I wrote down 9/11, I wrote down 3/11 and I wrote down 12/21. I said "Okay, God, where is the year? The year is missing." He said "Okay. Look at the verses." To get these dates here (indicating), the verses will give you those dates, like you have 9 and 11 in there, you have four minus seven is three, four plus seven is 11, these are Bible verses, you have 9, 10, 11, 12, if you could individual ones. And then if you could the 10 in there and you say, "Okay, 9 and 10 is 19, count the individual ones and the 11, that's 21."
>
> I said "Okay, God, I got that, but the year is still missing." He said, "Look at the verses that you did not use." So when you look at the verses that you did not use the – those verses will give you the years that belong to this – these months and these days. And the verses I did not use was 1, 2, 3, 5, and 6. I used every verse in here, every other verse from 1 until 11 over where, except for these five verses. These are the years, if you put 9/11/2001, 3/11/2005, and 12/21/2033.
>
> He said, "Bracket them off –" and when I did that, he said, "Now, bracket them off." Six, six, six. The verses I didn't use are the years, there's your 1, there's your 2, there's your 3, there's your 5, and there's your 6, then the number of men.
>
> They wanted to know – and I can do every one, every chapter, I can do it off the top of my head, just like that without even looking at it, and only God can give somebody – I'm going to go to my grave with that, only God can give somebody that kind of revelation knowledge, and I've never seen – and they – each one holds an entirely different calculation, each one.

(Pl.'s Dep. 142:4 – 143:22, Dec. 9, 2009.) Over the next few days, Mitchell shared her calculations and revelations with about two dozen co-workers, some of whom shared her faith and had, up to that point, regularly discussed religion with her at work. She asserts that she asked and received permission to share her news with each person, before explaining her numbers.

---

[4] Plaintiff argues that her deposition transcripts filed in this case are not credible, and moves to strike them from the record. The Court addresses that motion in Section II of this Opinion.

(Pl.'s Dep. 151:3-10.) She also shared her calculations with her cousin Cosby, who had called with the original Bible verse prompt. In her deposition, she said "I called Cosby that evening and told Cosby what I got, and he, like the rest of them and everybody, just freak out." (Pl.'s Dep. 150:14-15.) She acknowledged that Cosby and some of her co-workers told her that she was "scaring" them, and that one long-time friend of hers, a spiritual man, told her "Claudette, if you don't stop this, we're going to have to quit talking." (Pl.'s Dep. 151:1-17; 159:16-17.)

Several of Mitchell's co-workers reported these conversations to Marty Brewer ("Brewer"), the Operating Room Director. (Brewer Aff. ¶ 6, June 10, 2010.) Some complained about Mitchell's perceived cornering of a physician, who onlookers felt could not leave the conversation. (*Id.*) Others reported that Mitchell was "plotting the end of the world" in the break room. (*Id.* ¶ 8.) Some of the complaining employees were uncomfortable with the subject matter of Mitchell's conversations; others were merely concerned about Mitchell's well-being.[5] (*Id.* ¶ 7.)

On February 9, 2005, Brewer met with Mitchell. Mitchell characterizes the meeting as a "verbal warning" in which Brewer told her not to discuss religion at work anymore or she could be subject to discipline, up to and including termination.[6] (Pl.'s Dep. 183:6-9.) Brewer characterizes the event as a sort of counseling session, where she told Plaintiff to use judgment when speaking to other employees about personal matters and suggested that Mitchell meet

---

[5] Apparently, Mitchell had endured numerous personal crises in the years preceding this event. Her son was shot on more than one occasion, her mother had become terminally ill and passed away, and Mitchell had been involved in several domestic disputes with her brother. These unfortunate events undoubtedly have had a profound impact upon her.

[6] Mitchell said in her deposition that she told Brewer she could not stop talking about religion at work and thus could not comply with Brewer's request to talk about religion before or after work, but not on hospital time. We "went around and around and around over it, and I told her I couldn't do that. I wouldn't do that. She was talking about my salvation." (Pl.'s Dep. 155:16-19.)

confidentially with someone in the Employee Assistance Program. (Brewer Aff. ¶¶ 10-11.) In any event, the parties agree that Mitchell did not receive any formal discipline, nor any change in work hours, pay or position. (Pl.'s Dep. 182:20-183:9.)

Nonetheless, Mitchell was upset about the meeting and told Brewer that she wanted to resign. (Brewer Aff. ¶ 12.) Brewer refused to accept Mitchell's resignation and encouraged Mitchell to rethink her position, at least overnight. (*Id.*) In her affidavit, Brewer said "Plaintiff's clinical work was good, and I did not want her to resign." (*Id.*) However, Mitchell did voluntarily tender her letter of resignation the next day.[7] (Pl.'s Dep. 165:3-167:3, Dec. 9, 2009.) At the hospital's request, she agreed to stay on for another month, until March 11, 2005. (*Id.*) During her final month of work, Mitchell continued to talk about religion and her calculations, however, she did not receive any discipline and was not aware of any complaints. (Pl.'s Dep. 201:7-202:18.)

In late February, Mitchell contacted Esther Choi ("Choi"), the Hospital's Employee Relations Manager. (Choi Aff. ¶ 7, June 10, 2010.) On March 1, 2005, Mitchell and Choi discussed the meeting with Brewer, Mitchell's resignation and Mitchell's concern that she had been disciplined and told not to talk about religion. (*Id.* at ¶ 9.) Mitchell felt she was being singled out because other Christian employees were still allowed to talk about their religion. The parties agree that at some point during that meeting Mitchell told Choi that she was interested in

---

[7] The parties produced slightly different versions of Plaintiff's resignation form. Mitchell asserts that the Hospital's copy is "fake." However, the Hospital argues that the document it produced is from an earlier point in time, and thus does not have some of the additional notations from the Human Resources Department that are found on Plaintiff's document. For the purposes of this Opinion, the Court relies on Plaintiff's later version. To the extent the Plaintiff asserts that the differences in the document create a disputed issue of fact, the Court disagrees. The differences in the documents are not material and do not suggest any bad faith by the Defendant. Furthermore, Plaintiff does not dispute the substance of either document – that she resigned her position on Feb. 11, 2005 based on her discussion with Brewer, and that she agreed to work an additional month, per the Hospital's request.

5

rescinding her resignation, and that Choi asked Mitchell to give Choi a few days so that she could talk to Brewer about it. (*Id.* at ¶ 11.) Choi says she told Mitchell that Brewer would have to decide whether Mitchell could rescind her resignation. (*Id.*) The parties dispute whether it was Choi's responsibility to get back to Mitchell about her request, or Mitchell's responsibility to talk to Brewer about rescinding her resignation. In any event, Choi and Brewer did discuss the matter, and Brewer indicated to Choi that Mitchell could stay, but if other employees complained about similar conversations, Brewer would have to address the issues again. (Id. ¶ 11.) Mitchell never contacted Brewer about her desire to rescind her resignation, and Brewer assumed that that meant Mitchell did not want to resign. Mitchell left her employment on March 11, 2005, the day originally agreed upon.

Mitchell had trouble finding employment after she left University Hospital. She eventually applied for and was awarded Social Security disability benefits. In July 2007, after retaining counsel, Mitchell filed this lawsuit in Jefferson Circuit Court. The Hospital removed. In February 2010, Mitchell's attorney moved to withdraw; the Court granted the motion. Plaintiff has been unable to obtain another attorney and is now proceeding pro se. Nonetheless, after the Hospital filed its summary judgment motion, Mitchell filed more than 200 pages of response materials. She filed another 100-plus pages in response to the Hospital's Reply, along with two additional motions. The Court has reviewed all of these documents.

## II.

The Court will first address Mitchell's motion to strike the deposition transcripts filed by the Hospital. This issue is a prime example of how Plaintiff's lack of legal understanding has complicated this case.

6

On June 10, 2010, the Hospital filed transcripts of Mitchell's depositions, taken on December 9, 2009 and February 16, 2010. At the time those depositions were taken, Mitchell was represented by counsel. On March 9, 2010, the Court entered an Order allowing Mitchell's attorney to withdraw from the case. Since then, Mitchell has proceeded pro se. Now, Mitchell asks the Court to strike the depositions for two reasons: (1) because the Hospital did not provide her with transcripts prior to the discovery deadline, and (2) because she did not have the opportunity to read over the depositions, correct them if necessary and sign them.

The Hospital responds to Mitchell's first argument by asserting that her attorney at the time the depositions were taken, Michael Boylan, said he did not need copies of the transcripts and refused to purchase them. Mitchell asserts she was unaware of this. On May 27, 2010, Mitchell filed a letter with the Court requesting that the Hospital provide discovery, because the deadline set by the Court had passed on May 18, and the Plaintiff had not received anything. This appears to be Mitchell's first request for discovery since parting ways with her attorney. On June 10, 2010, the Hospital responded with a list of all the discovery documents it had provided to Plaintiff's counsel. That same day, the Hospital filed Mitchell's deposition transcripts.

Federal Rule of Civil Procedure 30(f)(3) governs copies of deposition transcripts. It states:

> Unless otherwise stipulated or ordered by the court, the officer must retain the stenographic notes of a deposition taken stenographically or a copy of the recording of a deposition taken by another method. When paid reasonable charges, the officer must furnish a copy of the transcript or recording to any party or the deponent.

Fed. R. Civ. P. 30(f)(3). Here, Mitchell's attorney declined to purchase copies of the transcripts. The Hospital was not aware that Mitchell was seeking copies until her letter of May 27, 2010. Two weeks later, the Hospital filed a copy of the deposition transcripts, effectively making them

7

available to Mitchell at no cost. Clearly, this is more than the rule requires of the Hospital, especially where Mitchell's attorney previously refused the transcripts.

Plaintiff's next argument is that she was not given the opportunity to read over the depositions, correct them if necessary and sign them. Federal Rule of Civil Procedure 30(e) governs review of a deposition by a witness. It states:

> On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
> (A) to review the transcript or recording; and
> (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e). Here, Mitchell did not challenge the validity of the depositions until July 2, 2010 – more than four months after the date of her last deposition. Even then, she did not take issue with any particular statement or challenge the court reporter's transcription of any statement or fact. She does argue broadly that the deposition transcripts are not "credible." Such generalized assertions are not sufficient to create a real dispute as to the content of the transcripts. Furthermore, even though Mitchell may not have known that the transcripts were available, it is clear that her attorney at the time knew they were available for review. Therefore, any complaint she has regarding her window of opportunity to review her deposition is most appropriately made to her former attorney. It is neither the responsibility of the Defendant, nor of the Court, to make a pro se plaintiff aware of the Federal Rules of Civil Procedure.

For these reasons, the Court will deny Mitchell's motion to strike the deposition transcripts, and proceed to the Hospital's summary judgment motion based on the facts of record.

**III.**

Summary judgment is proper "if the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(C). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact which requires the denial of a summary judgment motion." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). In determining whether summary judgment is appropriate, the Court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**IV.**

Kentucky's Civil Rights Act makes it "an unlawful practice for an employer: (1) ... to discharge an individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's ... religion." KRS § 344.040(1). Religion is defined as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without an undue hardship on the employer's business." KRS § 344.040(7). Kentucky cases hold that this law "is the same in intent as Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C.

9

§ 2000e-2(a)(1) and 20003-2(j)." *Evans v. General Tire and Rubber Co.*, 662 S.W.2d 843, 845 (Ky. App. 1983) (citing *Ky. Comm'n on Human Rights v. Ky. Dep't for Human Resources*, 564 S.W.2d 38 (1978)).

There are two basic types of religious discrimination claims that an individual can bring under Title VII – a religious accommodation claim or disparate treatment claim.[8] *Reed v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009); see *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (2000); see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Mitchell's claim appears to be a religious accommodation claim, but, out of an abundance of caution, the Court will address both.

A.

Like KRS Chapter 344, Title VII "provides for religious accommodation claims in its definition of religion. ... This definition imposes upon employers a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship.'" *Reed,* 569 F.3d at 579. In the Sixth Circuit, a religious accommodation analysis begins with the employee establishing a prima facie case of religious discrimination. *Id.*

> To establish a prima facie case, [a plaintiff] must show that (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. Once an employee has

---

[8] Defendant appears to interpret Mitchell's Complaint or deposition testimony to allege a common law wrongful termination claim. In Kentucky, a plaintiff may not bring a common law wrongful termination claim along with a statutory discrimination claim based on the same behavior. See *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985) ("the claim of sex discrimination would not qualify as providing the necessary underpinning for a wrongful discharge suit because the same statute that enunciates the public policy prohibiting employment discrimination because of 'sex' also provides the structure for pursuing a claim for discriminatory acts in contravention of its terms"). Thus, the Court does not address Plaintiff's wrongful termination claim, to the extent there is one, because it is subsumed by the religious discrimination claim.

10

> established a prima facie case, [the defendant] has the burden to show that it could not reasonably accommodate the employee without undue hardship.

*Id.* at 580 (quoting *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002) (internal citations omitted)). Here, the Hospital does not dispute that Mitchell's evidence satisfies the first two elements – she has sincere religious beliefs that conflict with the Hospital's harassment policy, and she informed her supervisor about her conflict. The Hospital does dispute, however, that Mitchell was "discharged or disciplined," for the purposes of the third element. Mitchell seems to argue that Brewer's directive not to discuss religion with her co-workers constitutes discipline for the purposes of the prima facie test.

The Sixth Circuit has "declined to relieve a religious accommodation plaintiff of his burden to establish a prima facie case, including the requirement that he demonstrate that he has been discharged or disciplined." *Reed*, 569 F.3d at 580. "Unless a plaintiff has suffered some independent harm caused by a conflict between his employment obligation and his religion, a defendant has no duty to make any kind of accommodation." *Id.*

1.

Thus, this Court must determine whether the circumstances of Brewer's statements, including her requirement that Mitchell stop discussing religion at work is sufficient "discipline" for the purposes of meeting the prima facie test. In *Reed*, the Sixth Circuit considered whether a union employee's loss of pay, as the result of a proffered accommodation, constituted discharge or discipline. *Id.* The court concluded that it did not. In its opinion, the court declined to decide whether any action sufficient to meet the presumably lower "adverse employment action" standard in a disparate treatment claim would also be sufficient to meet the "discharge or discipline" standard in a religious accommodation claims. *Id.* at 581. Instead, the court held that

11

the plaintiff's loss of pay was insufficient to meet even the "adverse employment action" test, and thus it did not need to decide whether the discharge or discipline standard required more harm. *Id.*

This holding strongly suggests that Mitchell must show her discipline rises at least to the level of an "adverse employment action" to meet the "discharge or discipline" element of the prima facie case. The Sixth Circuit has defined a materially adverse employment action as

> a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Such a change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) (internal quotations ommitted). Here, Mitchell acknowledges that she received no formal discipline, no loss in benefits or pay and no change in job responsibilities or title. The discipline consisted of an order not to discuss religion at work. Because this discipline is minimal and was not sufficient to meet the adverse employment action test, it also does not rise to the level of "discipline" under the prima facie test for a religious accommodation claim.[9]

2.

---

[9] To the extent Mitchell asserts that she meets the third element of the prima facie because she was constructively discharged, that argument fails, too. To show constructive discharge, a plaintiff must show that "1) the employer ... deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Logan v. Denny's*, 259 F.3d 558, 568-69 (6th Cir. 2001) (internal quotations omitted). There is not a shred of evidence that the Hospital created intolerable working conditions, as perceived by a reasonable person, or that anyone at the Hospital wanted Mitchell to quit. The evidence shows the opposite – that Mitchell's supervisor refused to allow her to resign the day of the meeting, encouraged her to get help and wanted her to stay.

But even if this Court concluded that Mitchell had been disciplined, her religious accommodation claim would still fail because the Hospital could not reasonably accommodate Mitchell's conflict without undue hardship. Religious accommodation claims typically involve disputes about working on a Sabbath or wearing religious clothing – things that do not necessarily impose on other employees. See *Chalmers v. Tulon Company of Richmond*, 101 F.3d 1012, 1021 (4th Cir. 1997). This case is different. Mitchell wants to be able to have religious conversations with co-workers, including conversations about the dates God sent her, and whether they could be the date for the end of the world or the Antichrist. Such conversations, the record shows, were offensive and troubling to other employees. They also violated the Hospital's harassment policies. Any accommodation of Mitchell's behavior would necessarily infringe on the rights of other employees. Therefore, there is no way to accommodate Mitchell's religious beliefs without imposing an undue burden on the Hospital.

A handful of other circuits have considered similar cases and come to the same conclusion. See *Wilson v. US West Communications*, 58 F.3d 1337, 1342 (8th Cir. 1995) ("Title VII does not require an employer to allow an employee to impose ... religious views on others."); *Chalmers*, 101 F.3d at 1021 (finding that an employer could not accommodate an employee's need to send religious letters without undue burden and noting "where an employee contends that she has a religious need to impose personally and directly on fellow employees ... the employer is placed between a rock and a hard place"). For these reasons, the Court must dismiss Mitchell's religious accommodation claim.

B.

It is not clear whether Mitchell intends to assert a religious discrimination claim based on disparate treatment. Because she argued in her deposition that she was treated differently than other employees who had religious discussions, the Court will briefly discuss the standard for a disparate treatment claim.

To make out such a claim, a plaintiff must produce direct evidence of religious discrimination or present a prima facie case of indirect discrimination by showing (1) that she was a member of a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified for the position, and (4) that she was replaced by a person outside of the protected class or that she was treated differently than similarly situated employees. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007). The Court discussed Mitchell's failure to meet the second prong of the test in the previous section. Mitchell also fails to meet the fourth prong, requiring that she show she was "treated differently than similarly situated employees," because, in a religious discrimination claim, the disparate treatment must be based on the plaintiff's religion. Here, Mitchell was not treated differently because of her religion. Rather she was treated differently because of her own actions and how her religious beliefs were impacting others. For these reasons, Mitchell's disparate treatment claim fails.

V.

Mitchell also appears to assert that the Hospital created a hostile work environment. To state a prima facie case of hostile work environment based on religious discrimination Mitchell must prove that (1) she was a member of a protected class; (2) she was subjected to unwelcome religious harassment; (3) the harassment was based on religion; (4) the harassment had the effect

of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) that the Hospital is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). The Court went on to say:

> In determining whether an environment is one that a reasonable person would find hostile or abusive and that the plaintiff in fact did perceive to be so, courts look at all of the circumstances, including: The frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 510 U.S. 17, 23 (1993) (internal citations omitted)). This language indicates that the analysis of a hostile work environment claim has both subjective and objective elements. While it is clear that Mitchell subjectively believed that she was being harassed, a reasonable person likely would not agree. To start, there was no real "harassment" per se – only a directive from Mitchell's supervisor to stop talking about religion. No one degraded or insulted Mitchell because of her religion. To the contrary, Mitchell's deposition describes a work environment that was very tolerant of her religion – co-workers brought their bibles to work, quoted scripture and held bible studies on breaks. Many shared Mitchell's faith, including Brewer.

Mitchell also did not offer any evidence that the Hospital created an intimidating, hostile or offensive work environment. By all accounts, Mitchell did good work and her bosses were happy with her performance. She worked at the Hospital, successfully navigating the line between work and personal life, for three years without incident. It was only after Mitchell started discussing her calculations, and the Hospital issued an objectively reasonable warning, that Mitchell felt harassed. Thus, the proof in this case is not sufficient to allow a claim for hostile work environment to go forward because Mitchell cannot show that she was harassed

15

based on her religion and that the harassment created an intimidating, hostile or offensive work environment.

## VI.

Mitchell's last claim is that her First Amendment right to free speech was violated when Brewer told her that she could not discuss religion at work. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech... ." U.S. Const. Amend. I. The Fourteenth Amendment's due process clause makes the protections provided for in the First Amendment applicable to the states. However, violating the First Amendment requires state action. *U.S. v. Morrison*, 529 U.S. 598, 621 (2000). The Fourteenth Amendment's protections offer "no shield against merely private conduct, however discriminatory or wrongful." *Id.* (citing *Shelly v. Kramer*, 334 U.S. 1, 13 (1948)). Here, Mitchell must show that the Hospital is an instrumentality of the state of Kentucky or that its conduct amounts to state action.

In *Lebron v. Nat'l R.R. Passenger Corp.*, the United States Supreme Court laid out a three-part test for determining when a corporation is a government actor. 513 U.S. 374, 392 (1995). The *Lebron* court said a plaintiff must prove: (1) that either the federal or state government created the corporation by a special law, (2) that the corporation was created for the furtherance of governmental objectives, and (3) that the federal or state government retained for itself permanent authority to appoint a majority of the directors of the corporation. *Id.* All three elements must be met. *Id.* Here, the Hospital is a 501(c)(3) non-profit corporation organized under the under the general non-profit corporation statutes of the state of Kentucky. According to its Articles of Incorporation, the Hospital was created for the purpose of treating patients and performing education and scientific research. The government has no authority to appoint a

majority of the Hospital's Directors. Therefore, the Hospital meets none of the *Lebron* requirements.

The question remaining then, is whether the Hospital's conduct amounts to state action. "The principal inquiry in determining whether a private party's actions constitute 'state action' under the fourteenth amendment is whether the party's actions may be 'fairly attributable' to the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) (citing *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982)). The Supreme Court has set forth three tests for determining when a private entity's action becomes state action: (1) the public function test; (2) the state compulsion test, and (3) the symbiotic relationship test, also referred to as the "nexus" test. *Wolotsky*, 960 F.2d at 1335. Here, the Hospital's function was not an function traditionally performed exclusively by the states, such as holding elections or exercising eminent domain. *Id.* Additionally, there is no evidence that the Hospital's actions were compelled by the state, nor is there evidence that there was close relationship between the state the Hospital such that the state was intimately involved with Hospital's directive to Mitchell. The mere fact that the state provides funding and regulates the Hospital does not mean that the Hospital is a state actor. See *Taylor v. The Hospital, Inc*. 2005 U.S. Dist. LEXIS 7269, *9-10 (W.D. Ky. 2005) (citing *Crowder v. Conlan*, 740 F.2d 447, 450-51 (6th Cir. 1984)). Because the Hospital was not a state actor and its actions did not amount to state action, Plaintiff cannot rely on the protections of the First Amendment. Her free speech claim must be dismissed.

None of Plaintiff's claims have survived Defendant's summary judgment motion, as such, her case must be dismissed in its entirety. This decision renders moot Plaintiff's motion for Defendant to produce certain documents at trial.

17

The Court will enter an Order consistent with this Memorandum Opinion.

cc: Claudette Mitchell, *Pro Se*
Counsel of Record